UNITED STATES BANKRUPTCY COURT       **NOT FOR PUBLICATION**
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------x

In re:                         Chapter 11
                             Case No. 04-12078 (ALG)

MARKETXT HOLDINGS CORP.,

                        Debtor.

------------------------------------------------------------------x

In re:                         Chapter 11
                             Case No. 05-13470 (ALG)

EPOCH INVESTMENTS, LP.,          (Jointly Administered)

                        Debtor.

------------------------------------------------------------------x

## MEMORANDUM OF OPINION

A P P E A R A N C E S:

DENNER & ASSOCIATES, P.C.
Attorneys for Empyrean Investment Fund, LP, *et al*
Four Long Fellow Place, 35th Floor
Boston, Massachusetts 02114
        By:  Robert S. Sinsheimer, Esq.

BRAUNER BARON ROSENZWEIG & KLEIN, LLP
Attorneys for Alan Nisselson, Chapter 11 Trustee of Market XT Holdings Corp.
61 Broadway, 18th Floor
New York, New York 10006
        By:  Howard L. Simon, Esq.

GOLENBOCK EISEMAN ASSOR BELL & PESKOE, LLP
Attorneys for Epoch Investments, LP.
437 Madison Avenue
New York, New York 1002
      By: Jonathan L. Flaxler, Esq.
         Andrea B. Schwartz, Esq.

KAYE SCHOLER LLP
Attorneys for the Official Committee of Unsecured Creditors of MarketXT Holdings Corp.
425 Park Avenue
New York, New York 10022
      By: Lester M. Kirshenbaum, Esq.
        Margarita Y. Ginzburg, Esq.
        Dina S. Rovner, Esq.

GABRIEL DEL VIRGINIA, ESQ.
Attorney for Omar Amanat
641 Lexington Avenue
New York, New York 10022
        By: Gabriel Del Virginia, Esq.

**ALLAN L. GROPPER**
**UNITED STATES BANKRUPTCY JUDGE**

In this latest chapter of the continuing litigation between Market XT Holdings Corp.

("Market XT") and its affiliate, Epoch Investments, L.P. ("Epoch"), on the one hand, and

Empyrean Investment Fund, L.P. ("EIF") and its affiliates and controlling shareholder, Rauf

Ashraf ("Ashraf"), on the other, Epoch as Chapter 11 debtor has moved (i) for an order

expunging the proof of claim filed in its case by EIF, and (ii) for summary judgment on five

counts of its counterclaims filed against EIF.  Epoch's motions are supported by the Chapter

11 trustee for Market XT ("Trustee") and by its creditors committee (Epoch, the Trustee, and

the creditors committee are collectively referred to as the "Objectors").[1]  The counterclaims,

*inter alia*, seek the recovery of certain transfers of funds from Epoch to Ashraf-controlled

entities, alleging that the conveyances were fraudulent under Federal and/or State law and

that they represented the conversion of Epoch money by EIF.

Certain of the background facts relevant to the instant motions are set forth in prior

opinions of this Court.  In a decision dated January 10, 2006, *Nisselson v Empyrean*

*Investment Fund (In re MarketXT Holdings Corp.)* 336 B.R. 39 (Bankr. S.D.N.Y. 2006), the

Court held Ashraf and his companies in civil contempt for having taken funds out of a court-

ordered escrow.  The decision, which was issued in an adversary proceeding in which the

Trustee is seeking to avoid as fraudulent conveyances certain transfers to EIF and other

---

[1] The Epoch and Market XT cases are being jointly administered.  The Trustee has moved to substantively consolidate the two cases and Epoch has joined in the motion, but EIF has opposed, and the motion has not been decided.

2

Ashraf-controlled funds, discusses the formation of EIF; the relationship between its

principal, Ashraf, and the principal of Market XT, Omar Amanat; and the transfer to EIF of

up to $30 million in transactions that, the Trustee contends, were (among other things)

intentionally designed to "hinder, delay or defraud" creditors of Market XT.   In another

decision, also dated January 10, 2006, *E\*Trade Fin. Corp. v. MarketXT Holdings Corp. (In re

MarketXT Holdings Corp.)*, 336 B.R. 67 (S.D.N.Y. 2006), the Court denied the motion of EIF

to intervene in litigation commenced by the Chapter 11 Trustee of Market XT on the ground

that EIF had failed to file a proof of claim in the Market XT case, was not a creditor and

could not intervene in its guise as an adversary proceeding defendant.  In a decision dated

August 11, 2006, 347 B.R. 156, the Court denied the motion of EIF to dismiss the Epoch

case; the decision (which is on appeal) discusses the formation of Epoch by Amanat as a trust

to benefit members of his family.

EIF has filed a proof of claim against Epoch, and that claim is the subject of this

litigation, together with the counterclaims that Epoch filed against EIF.  In brief, the

Objectors contend that EIF does not have a claim for essentially two reasons.  First, it is

alleged that all of EIF's rights derive, at best, from transfers that are avoidable as fraudulent

conveyances.  Second, Epoch contends that it did not have a debtor-creditor relationship with

EIF but instead invested its own money in EIF-managed hedge funds – money that was

rightly returned to it as a return of capital and not properly characterized as a debt to be repaid

to EIF.  EIF asserts in response that it is a legitimate creditor of Epoch and that its debt is

evidenced by a note signed by Amanat (the "Note"), Epoch's settlor.  As to the counterclaims

filed by Epoch against EIF, EIF denies that it was the recipient of any fraudulent transfers and

denies that it converted funds belonging to Epoch.[2]

By agreement of the parties, Epoch's contentions relating to the avoidance of EIF's

claims were severed and reserved for consideration, if necessary, in connection with or

subsequent to trial or other disposition of the avoidance claims brought by Market XT against

EIF and its affiliates.  The matters designated for immediate trial were Epoch's other

objections to EIF's claims and the counts of the counterclaims charging in effect that EIF had

converted Epoch's money.  These remaining issues were tried before the Court on September

18, 2006.  The following findings of fact and conclusions of law are based on the testimony

and the exhibits of record.

Discussion

The principal witness for the Objectors was Elan Ben-Avi, an accountant who traced

the flow of the funds that are in dispute.  In brief, the Objectors established that all of the

funds, totaling $15.5 million, emanated from the proceeds of a transaction between Market

XT and Bank of America that monetized certain shares of stock that Market XT had

previously received.[3]  As relevant for present purposes and as established by Ben-Avi, EIF or

one of its funds thereafter transferred $757,000 to a firm called Acument Holdings in April

and June 2003 (hereinafter called Transaction A), and $12,300,000 to an account in the name

of Epoch or its predecessor at Bank Sarasin in June 2003 (Transaction B).  Of this latter sum

of $12.3 million, $7.6 million was thereafter transferred to one of Ashraf's funds, Ash

---

[2] Epoch also asserts that EIF is not a real party in interest. Fed. R. Civ. P. 17, incorporated by Bankruptcy Rule 7017, provides that "[e]very action shall be prosecuted by the real party in interest." As further discussed below, EIF has a real interest because the Note on which the debt is based is in the name of EIF and the interests of various funds controlled by Ashraf are at best secondary.  Moreover, EIF is the sole defendant on the counterclaims.

[3] These were the transactions described in the opinion of January 10, 2006, 336 B.R. at 39. The Objectors contend that this and other transfers to EIF were fraudulent, but as noted above, this issue was taken out of the present dispute and reserved for later disposition.

Offshore Fund, in July 2003 (Transaction B-1), and $3.9 million was transferred to another

Ashraf Fund, Ash Master Fund II in August 2003 (Transaction B-2). Ash Master Fund II

thereafter transferred the money it received in Transaction B-2 (or other funds, money being

fungible), as follows (as relevant here): $2 million in August 2003 to an Ash Master Fund

account at Goldman Sachs (Transaction C); $350,000 to an Epoch account at Sanford

Bernstein & Co. in November 2003 (Transaction D); and $1,375,000 to an Epoch account at

Citibank between January and March 2004 (Transaction E).

In summary, Transaction A is a transfer out of an EIF-related account to Acument.

Transactions D and E are transfers out of an EIF-related account to an Epoch account.

Transactions A, D, and E represent the components of EIF's proof of claim against Epoch,

totaling $2.75 million with interest. Transactions B-1 and B-2 represent transfers out of the

Epoch Bank Sarasin account to an EIF account and Transaction C represents the transfer of a

portion of these funds to a different EIF account. Totaling $9.6 million on a net basis,

Transactions B-1, B-2 and C comprise Epoch's counterclaim.

Ben-Avi only traced the funds and did not testify as to why the various transfers were

made and whether they were properly documented at the time they were made. The record

on these issues is not straightforward and must be separately analyzed with respect to each

transfer.

With respect to Transactions A, D and E that make up EIF's proof of claim, the record

establishes that Amanat signed a note on behalf of Epoch that purported to represent a

promise by Epoch to repay an amount equivalent to these transactions. Amounts representing

these transactions are listed on a page called Schedule II to Secured Note, dated April 20,

2003. The Objectors established that the Note itself was a copy of a note that the parties had

used in another transaction, that the prior note was simply marked up and was not a good fit

for the Epoch transactions, that although the Note was dated April 20, 2003, it could not have

been completed until much later, and that Schedule II documents advances that were made as

late as March 2004.  Amanat testified that he did not remember when he signed the Note, and

the Objectors easily established that this backdated Note is not adequate, standing alone, to

evidence a legitimate debt of Epoch to EIF as "Lender."[4]  On the other hand, there is nothing

in the record to establish that the creation of this backdated Note was not an effort on the part

of Amanat, on behalf of Epoch and its affiliates, and Ashraf, on behalf of EIF and its

affiliates, to allocate the rights and liabilities of the two entities.  There is no dispute that

Amanat signed it, that he controlled Epoch at the time, and that he was then working closely

with Ashraf. Tr. 131, 146.  The real question on the claim filed by EIF is whether the record

of the hearing, on the limited issues before the Court, establishes that the Note should be

disregarded and whether the evidence establishes an intent to create a debt running from

Epoch to EIF.  The two transactions have to be separately analyzed.

Transaction A

Transaction A represented payments totaling $757,000 made by one of the EIF funds

to a company named Acument Holdings.  The direct testimony at trial relating to the reason

for these transfers is that of Ben Avi, who testified without objection that Acument is related

to a company known as Computer Clearing Services ("CCS") and that "Epoch made an

investment into Acument/CCS around that time." (Tr. 44)  The Court can also take judicial

---

[4] This is not the first instance of a backdated Note in these proceedings.  Ashraf's counsel disclosed to the Court that Ashraf had used, without counsel's knowledge, at least two other falsely backdated agreements. *See* letter dated May 9, 2006, of Rauf Ashraf to the Court admitting that he "placed into circulation in these proceedings two documents that are dated, signed, and notarized with dates different from when the documents were actually executed." Docket No. 188 in Adversary Proceeding 05-1268; *see also* Tr. of Hr'g on May 5, 2006 (Docket No. 191), pp. 8-14. The specific agreements that were falsely notarized did not include the Note at issue here.

notice of documents filed in other proceedings in the *Epoch* case that Epoch sold its shares in

CCS for $2,000,000 on or about January 12, 2006 (Docket No. 610).  Moreover, the instant

record contains a reference by Amanat to the Acument transaction (Tr. at 114), and an

Amanat affidavit introduced by EIF (Ex. C) that confirms that Epoch made an investment in

Acument/CCS and is the beneficiary of that investment.  Thus, there is nothing in the record

of these limited proceedings that establishes that it was improper on the part of the parties to

determine that Epoch should repay EIF for expenses that EIF had apparently advanced

relating to an investment that was intended to and did benefit Epoch.

Transactions D and E

Transactions D and E, in the total amount of $1,725,000, comprise the bulk of EIF's

claim against Epoch and the remainder of the Note.  It will be recalled that both of these

transactions represented transfers to Epoch of money that has been on deposit in one or

another EIF fund in Epoch's name.  This fact was born out by Ben-Avi's schedules and is not

contested.[5]

In order to sort out the rights of the parties on the instant record, it is necessary to

consider their relationship, and to do so without considering any of the Trustee's claims of

wrongdoing and fraudulent conveyance that were expressly excluded from the present

proceedings and reserved for a later date, if necessary.  The salient facts are that in early

2003, Amanat on behalf of Market XT was very hard pressed and desirous of selling or

otherwise obtaining cash for certain of the stock of E*Trade Financial Corp. that had been

received in an earlier transaction.  He agreed with Ashraf, as controlling person of a newly-

formed hedge fund, EIF, that certain of the stock would be pledged to EIF and that EIF in

---

[5] Of course, these same funds originally came from Market XT in transactions that Market XT claims were
fraudulent conveyances.  This is not relevant at this stage of the litigation, however.

return would advance to Market XT up to 50% of the then market value of the pledged

shares, payable only from the proceeds of the sale or other disposition of the stock itself.  The

Trustee alleges that in practical terms, EIF became entitled to nearly 100% of the face amount

of the proceeds of the stock by virtue of a 19% interest rate on the "advance" and a

prepayment penalty equal to 19% per annum if Market XT paid off the "loan" early.  As

noted above, the Trustee has brought proceedings against EIF to set aside this transaction and

has obtained an affidavit from Amanat in which he admits that it was designed to hinder,

delay or defraud creditors of Market XT.[6]

Whatever the bona fides of the transactions between Market XT and EIF, it is not

contested that Amanat and Ashraf were acting together closely, both in connection with the

transactions between Market XT and EIF and in connection with other business relationships.

This included the creation of Epoch itself.  Epoch was formed as a Colorado limited

partnership under the name Empyrean Investments LP (a name that is virtually

indistinguishable from Ashraf's principal vehicle, EIF, or Empyrean Investment Fund).  Its

first general partner was Ashraf himself, through the Ashraf Revocable Trust.  There is no

issue at this stage of the proceedings that Epoch was formed for an improper or illegal

purpose, and there is evidence in the record that it may have been formed to hold certain of

Amanat's individual claims against E*Trade and/or to benefit members of Amanat's family,

who held the initial 99% limited partnership interest in Epoch.  It may also have been

intended that Epoch would use funds from the 2003 stock sale to trade with E*Trade and that

it would hold some of Amanat's personal claims against E*Trade.  In any event, the record of

---

[6]The allegations set forth herein are discussed in much more detail in the Court's opinion at 336 B.R. 39, 46-49.
Ashraf and his funds have denied the Trustee's allegations that the transactions were intentionally or
constructively fraudulent and have asserted that they gave fair value to Market XT.  It is emphasized that no
finding has been made on these issues and as noted, they were severed from those considered in this opinion.

8

this case establishes that, eventually, it was decided to sever all connections between Ashraf

and Epoch, and on or about October 8, 2003, Ashraf was removed as sole trustee of the trust

which was general partner of Epoch, and that position was given to a member of Amanat's

family.  Ashraf also had signatory authority over Epoch's principal bank account at Bank

Sarasin, and that authority was transferred to Amanat's wife at a date that is uncertain on this

record but was probably in or about November 2003.

The most important fact for purposes of this decision is that there were many different

business relationships between Amanat and Ashraf and the companies they controlled, a close

relationship between the two men, and a frequent transfer of funds back and forth between the

companies.  Amanat testified in these proceedings that Ashraf "had all of the power and the

say and the control that I needed and I had very few and limited resources at the time, so we

were working very closely together." (Tr. 146.)  It bears repeating that the Objectors may be

able to establish that certain transfers were intentional or constructive fraudulent conveyances

or otherwise improper under applicable law.   The Objectors also established through the

deposition testimony of Ashraf (admitted at trial) that the Note was backdated, that it was

uncertain when it was signed, and that the schedule to the Note, which is the sole evidence of

the specific debts owed, was prepared by Ashraf and may have been prepared as late as early

2005.  Ashraf Deposition Testimony 6/30/06 at 136:13-23.[7]   Nevertheless, Amanat's

testimony is that he signed a note, most probably toward the end of 2003 or the beginning of

2004, at the time he and Ashraf were purporting to effect a formal separation of certain of

---

[7]  That is when a UCC financing statement was filed against Epoch on EIF's behalf (February 28, 2005).  At the hearing, EIF's counsel confirmed that the filing of the financing statement was within 90 days of Epoch's initial bankruptcy filing (the 90-day preference period), and that EIF has, if anything, an unsecured claim against Epoch. (Tr. at 5-6.)

9

their business interests.  Amanat testified at length and did not deny that the Note was an

appropriate allocation of assets and liabilities between Epoch and EIF.

Admittedly, Ashraf later prepared the schedule that allocated to EIF, in addition to the

sums paid to Acument, certain specific sums of money (Transactions D and E) that EIF had

earlier transferred to an Epoch bank account, that Epoch had transferred to an account at one

of the Ashraf-controlled funds, and that the fund had thereafter transferred back to Epoch.

Ashraf did not simply create a debt out of thin air, however.  Taking into account the fact that

Amanat was in actual control of Epoch at the critical times (to the extent Ashraf was not), the

evidence as a whole is that the parties in control intended that certain moneys that had been

transferred from (i) Market XT to (ii) EIF and then (iii) to Epoch and then (iv) to EIF and

finally (v) to Epoch would be deemed property of EIF in connection with the separation of

EIF and Epoch.  In other words, EIF has established by a preponderance of the evidence that

the parties in control intended to and did create a debt running from Epoch to EIF.[8]

The Objectors relied heavily on the fact that at the time EIF's accountants accounted

for the final transfer from an EIF fund to Epoch not as an advance or loan by EIF to Epoch

but as a return of a capital investment that Epoch had made in the respective EIF funds.

Nevertheless, the Trustee and the Committee argue, in pleadings filed in the adversary

proceeding Market XT has brought against EIF, that Ashraf directed his accountant to treat

the transfers of "some of the funds under Ashraf's control to Epoch" as a withdrawal of

---

[8] Although the claimant bears the initial burden of proving a claim, *In re Gorgeous Blouse Co., Inc.*, 106 F.
Supp. 465 (S.D.N.Y. 1952), filing of a proof of claim in accordance with § 501 is prima facie evidence of the
validity and amount of the claim.  4 King, *et al*, *Collier on Bankruptcy* ¶ 502.02[3][f] (15th ed. rev. 2004).  The
claimant is only required to prove the merits of the claim if an objection is made and evidence that supports the
objection is offered. *Id*. If the objecting party negates the prima facie validity of a proof of claim, the burden
shifts back to the claimant who then bears the ultimate burden of persuasion. *In re Rockefeller Ctr. Props.*, 241
B.R. 804, 817 (Bankr. S.D.N.Y. 1999). When the burden shifts back to the claimant, the claimant must "prove
the validity of the claim by a preponderance of the evidence." *Collier, supra*; *see also In re Harrison*, 987 F.2d
677 (10th Cir. 1993).

10

capital, rather than a loan, as part of a joint scheme of Amanat and Ashraf for "Amanat to

retain the control he desired over the E*Trade stock proceeds." (Pl's Mem. of Law in Supp.

of their Joint Mot. for Summ. J., dated November 3, 2006, p.16.) Suffice it to say for

purposes of these proceedings that the Objectors will have an opportunity to prove the

wrongdoing of Amanat and/or Ashraf in connection with the Epoch transactions, but the

manner in which Ashraf's accountants treated the transactions is not determinative.[9]

Counterclaims

Epoch's non-avoidance counterclaims against EIF were also tried. These claims

implicate Transactions B-1, B-2 and C, which comprise transfers aggregating $9.6 million

from an Epoch bank account to one of the EIF Funds. Ben-Avi established that all of the

funds in Transactions B-1, B-2 and C had their origin in funds that Market XT had transferred

to EIF and that EIF had then deposited in an Epoch bank account. Counts Eight and Nine of

the counterclaims charge that EIF converted these funds when they were sent back from

Epoch to EIF.[10] Count Seven also charges that the transfers constituted unjust enrichment,

and Count One is a claim for turnover of funds, but the Objectors refer in their papers only to

the conversion count and that is the claim that was pressed.

Under New York law, on which all parties rely, the elements of conversion are that

"(1) the party charged has acted without authorization, and (2) exercised dominion or a right

of ownership over property belonging to another, (3) the rightful owner makes a demand of

the property, and (4) the demand for the return is refused." *Fagan v. First Sec. Invs., Inc.*,

No. 04 Civ. 1021, 2006 U.S. Dist. Lexis 66065, at *10 (S.D.N.Y. Sept. 15, 2006); *see also*

*Seanto Exports v. United Arab Agencies*, 137 F. Supp. 2d 445, 451 (S.D.N.Y. 2001). There is

---

[9] That is also the position that EIF's counsel took, for other reasons.

[10] As the Counts are mis-numbered, with two counts titled "Count VII," the Court will treat the first "Count VII" as Count Seven and the next one as Count Eight.

no evidence on the record that Transfers B-1, B-2 and C represented the "exercise of dominion and ownership over property belonging to another." As discussed above, Ashraf was in effective control of Epoch until the fall of 2003. Transfers B-1, B-2 and C were made in or about July and August 2003. Even later, Ashraf continued to work closely with Amanat. Funds were continually transferred back and forth between EIF and Epoch, and the schedules filed by Amanat early in the Epoch case make no mention of any claims against EIF for moneys transferred or converted. It cannot be concluded on the instant record that the transfer from Epoch to EIF of funds that had earlier been transferred from EIF to Epoch constituted an unauthorized conversion of those funds by EIF.

Conclusion

For the reasons herein, Epoch's objection to EIF's proof of claim and its motion for summary judgment on the counterclaims are denied, without prejudice to the remaining claims and objections left for later determination. EIF should settle an order on five days' notice.

Dated: New York, New York
       March 1, 2007

                        _/s/ Allan L. Gropper_____ _
                        UNITED STATES BANKRUPTCY JUDGE